JUDGE JONES            06 CV 6391

LAW OFFICES OF VINCENT E. BAUER
475 PARK AVENUE SOUTH, 25TH FLOOR
NEW YORK, NEW YORK 10016
Tel: 212-575-1517
Fax: 212-689-2726



RECEIVED AUG 23 2006

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOSEPH DAVIS

          Plaintiff,

- against -

VIDA SHOES, INTERNATIONAL

          Defendant.

---

COMPLAINT

JURY TRIAL DEMANDED

Plaintiff Joseph Davis, through his attorneys, The Law Offices of Vincent E. Bauer, seeks redress for intentional discrimination against him by defendant Vida Shoes, International because of his race (African American) and religion (Muslim), and for his complaint hereby states as follows:

### The Parties

1. Plaintiff Joseph Davis ("Plaintiff" or "Mr. Davis") is and at all relevant times was a resident of Brooklyn, New York.

2. Defendant Vida Shoes, International ("Vida" or "Defendant"), upon information and belief, is a corporation authorized to conduct business within the state of New York, which regularly conducts business within this district.

## Venue and Jurisdiction

3. This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims under 42 U.S.C. § 1981 raise a federal question and because this Court has pendent jurisdiction over Plaintiff's state law claims.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to the claim occurred in this district and defendant is subject to personal jurisdiction in this district.

## Factual Background

5. Mr. Davis began to work for Vida in February 2004 as a freelance shoe designer. His performance in that capacity was consistently excellent.

6. As a result, he was hired by Vida as a full-time employee in September, 2004. Thereafter, he continued to perform his job duties in excellent fashion until February 27, 2006, the date on which Vida terminated his employment.

7. From the outset of his association with Vida, Mr. Davis was subjected to discriminatory conduct, and also witnessed conduct on the part of Vida senior managers which reflected a discriminatory animus toward blacks.

8. As an example, early in Mr. Davis' association with Vida, Mr. Davis visited Vida's offices with his finance partner, Kainon Jasper, who is African-American. During that meeting, Solomon Dabah, Vida's Brand Manager, attacked Mr. Jasper both professionally and personally, belittling his professional accomplishments, calling him an imposter, and lashing out at Mr. Jasper in a rage, screaming at him and approaching him with fists clenched. All this, despite the fact that Mr. Jasper conducted himself appropriately throughout this otherwise mundane business negotiation.

9.  Mr. Dabah also subsequently demanded that he never be required to deal with Mr. Jasper again.

10. Significantly, during the course of those same negotiations, Mr. Dabah remarked to Mr. Davis with respect to a business proposal that he had made, "I'm giving you an opportunity to get out of the ghetto," despite the fact that Mr. Davis then lived in a brownstone valued at $950,000.

11. Vida also failed to live up to its promises to Mr. Davis concerning the provision of support of his shoe design efforts. In that regard, Mr. Davis explained during negotiations with Solomon Dabah that, if his design efforts regarding the Phat Farm brand were to be successful, he would need factory capacity which would enable him to design the highest quality athletic shoes on a competitive schedule. He also would need a clearly defined position title and an adequate support staff. He was assured that he would receive that level of support.

12. Subsequently, Mr. Davis discovered that Vida's factory operations were dramatically sub-standard, and that he would nonetheless be held to the same quality and timing standards. He was also never given support staff or a clearly defined title. Of course, the lack of support provided to Mr. Davis negatively impacted the quality of the shoes he designed.

13. Mr. Dabah's bizarre, discriminatory conduct towards Mr. Davis continued throughout Mr. Davis' tenure at Vida. For example, in November 2004, Mr. Dabah, without any warning, tackled Mr. Davis from behind while he was walking on the street, driving him into a building wall. Because the two were in no way social friends, that hostile conduct could not be discounted as mere playfulness. Instead, it was a clear attempt to demonstrate his authority over Mr. Davis.

14. Mr. Davis was also, for the entirety of his tenure, excluded from most of the critically important Vida product design meetings. Other caucasian design directors were not similarly excluded.

15. In February 2005, at a Las Vegas footwear convention, Victor Dabah, Defendant's owner, slandered Mr. Davis' professional reputation. In that regard, despite the fact that Mr. Davis had been consistently truthful in his professional dealings with Vida, Mr. Dabah repeatedly called him a "con man" when he tried to identify the factory deficiencies which led to an unacceptable prototype shoe.

16. In Febuary, 2005, Solomon Dabah, upon learning of an IRS wage lien letter regarding Mr. Davis being sent to Vida, said "I don't know what's wrong with your people." Mr. Dabah subsequently discussed that confidential issue with other Vida employees, without Mr. Davis' permission.

17. Other Vida managers also made racially derogatory remarks and treated minorities with derision. For example, Mr. Davis was asked by a Baby Phat designer whether he knew any qualified graphic designers. Mr. Davis identified Amed Lago, a highly qualified designer who is African American.

18. Mr. Lago was invited to a meeting to discuss the possibility of working with Vida. After that meeting, Mr. Lago told Mr. Davis that Michael Zimmerman had asked him whether he could "bust a rap", apparently as a result of a mistaken assumption that all minorities rap.

19. He then asked Mr. Lago whether he had any weed they could smoke (Mr. Lago does not smoke marijuana). Offended by these stereotypical assumptions, Mr. Lago refused to do business with Vida.

20. In April 2005, during a product meeting, Solomon Dabah called Mr. Davis a "dumb fuck" without provocation. Mr. Dabah did not insult his white design directors in that manner.

21. Carlton Lester, another African-American designer, was also subjected to abusive treatment by Solomon Dabah. As an example, Mr. Dabah, who had convened an impromptu meeting, screamed at Mr. Carlton, who was delayed in joining the group because he was on the telephone with a client, "hang up the phone…hang it up…hang it up now!!" Mr. Lester, humiliated, complied, and joined the group without a word.

22. In May of 2005, Mr. Davis, who is of Moorish descent, converted to the religion of Islam. Thereafter, Vida's deplorable treatment of him worsened.

23. For example, Mr. Davis requested leave to miss a late-scheduled sales meeting which conflicted with a religious high holiday he had planned to celebrate in Atlanta. Although he was given permission to miss that meeting, he was later castigated for doing so, and his religious values were mocked by several members of the company, including Solomon Dabah, Arild Dietrichson and Michael Jonte.

24. Thereafter, Mr. Davis learned that he had not been invited on a research trip to Europe and Japan, while his peers were all invited.

25. Shortly thereafter, Mr. Davis was told that his employment was being terminated for budgetary reasons. When he asked why he had been selected, he was told that he was the highest compensated designer, an untrue representation. When he offered to accept a pay cut in lieu of termination, that offer was refused.

26. Subsequently, his employment was terminated on February 27.

27. Mr. Davis' performance at Vida was demonstrably better than that of his caucasian design colleagues. In that regard, Mr. Dietrichson, a design director, was hired in June of 2005,

having worked previously at Adidas. During his first season with Vida, Mr. Dietrichson produced 5 new products. None of them, however, were adopted into the line, so he was fruitless that first season (Spring 2006).

28. In contrast, Mr. Davis had produced 80% of the line that was adopted into production.

29. At the beginning of his second season, Mr. Dietrichson was still touted as the new design element that would add needed firepower to the design department. In that season, however, he was only able to complete 15% of what he was assigned, and only one of those products was included in the Fall 2006 line.

30. In contrast, Mr. Davis successfully completed 95% of what he had been assigned, and six of his new programs were adopted for use in the Fall 2006 line. Additionally, Mr. Dietrichson wasted roughly $60,000 in prototype tooling charges on prototypes which were never used for production, while Mr. Davis caused no such waste. Thus, it is apparent that Mr. Davis was not terminated for legitimate performance reasons.

## FIRST CAUSE OF ACTION
## VIOLATION OF 42 U.S.C. § 1981

31. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 30 as though fully set forth herein.

32. Vida's intentional discrimination against Plaintiff on the basis of his race and religion, as described above, constitutes a violation of 42 U.S.C. § 1981. The discrimination to which Plaintiff was subjected was part of a pattern and practice of discrimination against minorities within Vida.

33. As the direct and proximate result of Vida's violation of that statute, Plaintiff suffered economic damages and emotional pain and suffering, for which Vida is liable.

## SECOND CAUSE OF ACTION
## VIOLATION OF N.Y. EXECUTIVE LAW

34. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 33 as though fully set forth herein.

35. Vida's intentional discrimination against Plaintiff on the basis of his race and religion, as described above, constitutes a violation of the New York Executive Law § 296, et seq.

36. As the direct and proximate result of Vida's violation of that statute, Plaintiff suffered economic damages and emotional pain and suffering, for which Vida is liable.

## THIRD CAUSE OF ACTION
## VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE

37. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 36 as though fully set forth herein.

38. Vida's intentional discrimination against Plaintiff on the basis of his race and religion, as described above, constitutes a violation of the New York City Administrative Code provisions concerning discrimination.

39. As the direct and proximate result of Vida's violation of those provisions, Plaintiff suffered economic damages and emotional pain and suffering, for which Vida is liable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court: award him economic, compensatory and punitive damages, and attorneys' fees, in an amount to be determined at trial; direct Defendant to reinstate Plaintiff; and award Plaintiff such other and further relief as it deems just and proper. A jury trial is demanded.

Dated: New York, NY
August 18, 2006

Respectfully submitted,

Vincent E. Bauer (VB-0794)
Law Offices of Vincent E. Bauer
475 Park Avenue South, 25th Floor
New York, New York 10016

Counsel to Plaintiff