UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



JOSEPH DAVIS,

                  Plaintiff,

Case No. 06 Civ. 6391 (BSJ) (JCF)

-v.-

VIDA SHOES INTERNATIONAL, INC.,

                  Defendant

**OPINION AND ORDER**

BARBARA S. JONES, *District Judge*:

Plaintiff Joseph Davis brought this action alleging that Defendant Vida Shoes, International, Inc. unlawfully terminated his employment on the basis of race and religion in violation of 42 U.S.C. § 1981; New York Executive Law § 296 et seq.; and the Administrative Code of the City of New York.[1]  Defendant has moved for summary judgment on all of Plaintiff's claims; asserted a state law counterclaim for the repayment of a loan made to Plaintiff during his employment, plus interest; and also requests costs. For the reasons set forth below, Defendant's motion is GRANTED in its entirety; its counterclaim is GRANTED; and it may file a request for costs with the Court.

### I.    Jurisdiction

The Court has jurisdiction over Plaintiff's claim of racial discrimination under § 1981 pursuant to 28 U.S.C. § 1331.  Plaintiff's claim of religious discrimination is not cognizable under § 1981, and this claim is dismissed. *See Runyon v. McCrary*, 427 U.S.

---

[1] The Court construes Plaintiff's Complaint as asserting a claim under § 8-107 of the Administrative Code of the City of New York.



160, 167 (1976). The Court has jurisdiction over Plaintiff's state law claims pursuant to

28 U.S.C. § 1367(a).

## II.    Factual Background[2]

### A.    The Hiring and Firing of Plaintiff

Plaintiff alleges that he was illegally discriminated against by Defendant; its Vice-

President, Solomon Dabah ("Dabah"); and other senior managers at Defendant because

of his status as an African-American Muslim. Defendant claims it terminated Plaintiff

because of his poor performance and a work force reduction and restructuring

necessitated by falling revenue.

Dabah recruited Plaintiff in February 2004 as a freelance shoe designer for one of

Defendant's brands of men's footwear at a salary of $5,000 per month. At that time,

Plaintiff had more than fourteen years of experience as a footwear designer. Dabah

approached Plaintiff that September about full-time employment, and Plaintiff accepted a

position at an annual salary of $100,000. Plaintiff wanted a higher salary, and Dabah told

him that if business continued to grow he might receive a bonus or an increased salary.

In this position Plaintiff directed a team of three junior designers. Two of these

designers were African-American and one was Asian, and they earned salaries around the

range of $40,000 to $50,000. Defendant also employed at least one other designer to

design women's footwear in Plaintiff's division, a Caucasian who earned $95,000.

Defendant loaned Plaintiff $25,000 in installments from September 2004 to

March 2005. (Pl.'s Resp. Stmnt. Facts Ctr.-Stmnt. Facts ("Pl.'s Facts") ¶ 63.) In March

2005, after repeated complaints by Plaintiff regarding his salary, Defendant increased

---

[2] Unless otherwise noted, these facts are undisputed.

Plaintiff's salary to $150,000.  Defendant did so despite the fact that its sales were beginning to decline and Defendant had already loaned Plaintiff $25,000.  In September 2005 Defendant hired two more employees: Michael Jonte ("Jonte"), to work as a brand manager for Defendant's brands at a salary of $210,000; and a Caucasian senior designer, Arild Dietrichson ("Dietrichson"), to work on the same brand as Plaintiff at a salary of $125,000.

      Defendant terminated Plaintiff in February 2006 and claims this decision resulted from a restructuring and workforce reduction due to a severe drop in sales in Plaintiff's division.[3]  Jonte, who was responsible for company efficiency, recommended that Defendant terminate the highest paid designers; hire two junior designers; and promote Dietrichson to a new position that would report directly to him and direct the design departments of several of Defendant's brands.  According to Dabah, Jonte recommended Dietrichson for this promotion because he had displayed excellent management and organization skills, while Plaintiff had difficulty functioning in a team environment and his work had been untimely.  (Dabah's Aff. Supp. Def.'s Mot. Summ. J. ("Dabah's Aff.") ¶¶ 27, 29.)  Plaintiff insists that his work was clearly superior to the work of Dietrichson (Pl.'s Facts ¶ 18), although he does not supply any proof.  Several emails, discussed *infra*, show that some of Plaintiff's work was untimely and that Plaintiff's work style led him to clash with Jonte and Dietrichson.  Plaintiff's deposition testimony also shows that he clashed with several employees at Defendant.

      Defendant subsequently terminated Plaintiff; the manager of the division in which Plaintiff worked, an Asian who earned $450,000 per year; and one of the African-American junior designers that worked under Plaintiff.  Defendant promoted Dietrichson

---

[3] From 2004-2006, sales revenue in Plaintiff's division declined about eighty-four percent.

in March 2006 and increased his salary to $140,000, although he was terminated around April 2007. Also in March 2006 one of the junior designers previously working under Plaintiff resigned. The next month Defendant hired an African-American designer at a salary of $90,000, although he resigned in May 2007. Between February and April 2006 the aggregate salaries at Plaintiff's division decreased from $969,000 to $280,000. In October 2006 the Asian junior designer on Plaintiff's team resigned, as did the Caucasian designer of women's footwear. Since then no other designers have been hired in the division in which Plaintiff worked. No designers currently work for this brand and its future is under review. (Dabah's Aff. ¶ 34.)

When Plaintiff was terminated he offered to accept a salary reduction in exchange for keeping his job, but Dabah refused, reasoning that Plaintiff found his current salary inadequate and would resent a pay cut. Dabah did not refer to race or religion during Plaintiff's termination.

**B.     Alleged Racially Discriminatory Conduct**

Plaintiff alleges that several incidents occurred in which racially discriminatory conduct was directed towards him and other African-Americans. Plaintiff believes these incidents demonstrate that Defendant's proffered reasons for terminating Plaintiff are pretext. The first alleged incident occurred prior to Plaintiff's full-time employment. In February 2004 Plaintiff arrived at Dabah's office along with his African-American financial partner. Plaintiff and his partner wanted to discuss the payment of invoices for three months of freelance work, even though Plaintiff had only worked for one month at that point. According to Plaintiff, there was confusion regarding the rate at which Plaintiff would be paid if he worked for only one month as opposed to working for more

than one month, and this confusion led to the meeting. (Pl.'s Dep. 57-58.) Dabah claims

that Plaintiff's partner tried to renegotiate Plaintiff's salary and also attempted to solicit

business for himself. (Dabah's Aff. ¶ 42.) Plaintiff insists that Dabah knew Plaintiff's

partner would be attending the meeting and soliciting business. (Pl.'s Dep. 62-63.)

Dabah allegedly grew angry and stated that Plaintiff's partner had no experience

or credibility in the industry. (*Id.* 56.) Dabah also allegedly became annoyed because

Plaintiff's partner took cell phone calls during the meeting and allegedly wrote on

magazines on Dabah's desk. (Dabah's Aff. ¶ 43 n.1.) According to Plaintiff, Dabah

screamed at Plaintiff's partner, belittled him professionally and personally, and

approached him with clenched fists. (Pl.'s Facts ¶ 4.) Plaintiff believes that Dabah never

treated Caucasians this way. (*Id.* ¶ 5.) In regard to a business proposal made during the

meeting, Dabah allegedly told Plaintiff "I'm giving you an opportunity to get out of the

ghetto." (*Id.* ¶ 6.) Dabah also offended Plaintiff by asking him whether he thought a

particular advertisement would appeal to "the black guys in the hood," instead of using

the term "African-American." (Pl.'s Dep. 68-69.)

A second incident allegedly occurred in February 2005 when Dabah learned that

the Internal Revenue Service ("IRS") sent a wage lien letter to Plaintiff. (*Id.* ¶ 7.)

Plaintiff claims that Dabah told him "I don't know what's wrong with your people." (*Id.*)

On another occasion, a designer from one of Defendant's other brands asked

Plaintiff whether he knew any good graphic designers. Plaintiff recommended an

African-American who eventually interviewed with an employee at Defendant. The

employee asked the graphic designer if he could "bust a rap" and whether he had any

"weed" they could smoke, assuming that all African-Americans engage in both activities.

5

(Pl.'s Dep. 162; Compl. ¶¶ 18-19.)  This offended the designer and he refused to associate with Defendant.[4]

Plaintiff also describes several other episodes which made him uncomfortable, although he is unsure if some of them were motivated by racial discrimination.  First, Plaintiff alleges that in November 2004 Dabah "tackled" him while he was walking on the street, "driving him into a building wall."  (Pl.'s Facts ¶ 54; Pl.'s Dep. 140; Compl. ¶ 13.)  Plaintiff thinks that Dabah intended this act to show his authority over Plaintiff, and that it could not be understood any other way because they were not social friends.  (Compl. ¶ 13.)

Second, Plaintiff claims that Dabah once yelled at the top of his lungs at one of the African-American junior designers that worked under Plaintiff.  Plaintiff is not sure whether this was motivated by discrimination (Pl.'s Dep. 168), but he thinks that Dabah did not yell at Caucasian designers in this manner.  (Pl.'s Facts ¶ 51.)  Dabah had called an impromptu design team meeting, but the employee would not hang up the telephone after Dabah asked him repeatedly to do so.  Plaintiff contends that the employee could have been speaking with a client or anyone else, and that Dabah yelled at the employee to "hang up the phone.  Hang up the [expletive] phone now.  Hang the phone up now."  (Pl.'s Dep. 168.)  The employee subsequently joined the meeting, humiliated.  (Compl. ¶ 21.)

Third, according to Plaintiff, discrimination among other things played a role in his exclusion from many design meetings beginning around the third month of his

---

[4] Plaintiff does not allege that this employee played a role in his termination, and the Court finds that this incident adds little to Plaintiff's argument that racial discrimination factored into his termination.  While these comments may have been racially discriminatory, Plaintiff does not allege that he or Dabah were present when they were made.  Plaintiff had little interaction with the employee while working for Defendant, and the employee never said anything offensive to Plaintiff.

employment, while Caucasian design directors were not similarly excluded.  (Pl.'s Dep.

148-49; Compl. ¶ 14.)  Plaintiff notes, however, that these meetings generally consisted

of six people, including two African-Americans.  Plaintiff identifies three factors that

played into the decision to exclude him from these meetings: (1) it was unnecessary for

him to be there; (2) his superior technical knowledge, which everyone recognized, caused

him to frequently disagree with others at the meetings (Pl.'s Dep. 147); and (3) Dabah's

realization in the fall of 2005 that Plaintiff had converted to Islam.[5]

Fourth, Plaintiff claims that during a product meeting in April 2005 Dabah asked

Plaintiff why the factory consistently returned a product with mistakes.  (Pl.'s Dep. 163.)

Plaintiff explained to Dabah that the factory was at fault.  (*Id.* 164.)  Dabah grew

frustrated and allegedly called Plaintiff an expletive but then apologized.  (*Id.*)  Plaintiff

does not know if this comment was racially motivated.  (*Id.* 165.)  When he previously

blamed the factory for a poor quality prototype in February 2005, Dabah's father who

was a principal of Defendant allegedly told Dabah that Plaintiff was a "con man" in front

of several people.  (*Id.* 151; Compl. ¶ 15.)  Plaintiff does not know if racial

discrimination motivated this comment.  (Pl.'s Dep. 151.)

Plaintiff also complains that the factory never adequately supported him as

promised by Dabah; that he did not have sufficient support staff for about nine months;

and that his professional role was never clearly defined.  (*Id.* 86-87; Compl. ¶¶ 11-12.)

He argues that Defendant nevertheless held him to normal work standards, although he

notes that these problems were endemic at Defendant.  (Pl.'s Dep. 88-94; Compl. ¶ 12.)

---

[5] Plaintiff concedes that he was excluded from design meeting ten or eleven months before Dabah learned
of his religious conversion.  (Pl.'s Dep. 148-49.)

Plaintiff does not know if Dabah intentionally misled him on these issues so that he

would fail at his work.  (Pl.'s Dep. 95.)

Lastly, Plaintiff was not invited on a trip to Japan regarding one of his projects.

(*Id.* 129.)  Some of Plaintiff's colleagues, including Dietrichson, were invited.  (*Id.*;

Compl. ¶ 24.)  Jonte decided who went on the trip, but Plaintiff believes Jonte may have

received an instruction from Dabah not to bring Plaintiff.  (Pl.'s Dep. 137.)  Plaintiff

acknowledges that two African-Americans went on this trip.

### C.    Alleged Religiously Discriminatory Conduct

Despite the allegations discussed *supra*, Plaintiff concedes that he was generally

treated well at Defendant until the fall of 2005 when Dabah learned of Plaintiff's

religious conversion.  (Pl.'s Aff. ¶ 10.)  He believes that Dabah then "wanted [him] out"

because of his religion.  (Pl.'s Dep. 95.)  Plaintiff testified at his deposition that Dabah

learned of his conversion during a conversation in a taxicab in September 2005, and that

Dabah did not noticeably react at the time.  (*Id.* 101.)  Later in the deposition, Plaintiff

testified that Dabah once approached his desk during the Muslim holiday Ramadan, when

he was known to read the Koran while others were at lunch.  (*Id.* 102.)  Dabah then asked

Plaintiff if he was reading the Koran and whether he was a Muslim, stared blankly at him

for about a minute, changed the subject of the conversation, and walked away.  (*Id.*)

Plaintiff omits the taxicab conversation in his subsequent affidavit, submitted in

opposition to this motion.  Plaintiff does, however, discuss the second incident in his

affidavit.  (Pl.'s Aff. ¶¶ 12-13.)  In the affidavit, Plaintiff alleges that Dabah learned of

his conversion from a co-worker in October 2005 and immediately went to Plaintiff's

office, asked him if he was a Muslim, and whether he was reading the Koran.  (*Id.* ¶ 12.)

Dabah then allegedly stood silently for nearly a minute before walking away.  (*Id.* ¶ 13.)

Plaintiff asserts that after learning of his conversion Dabah's demeanor towards

him changed and he lost confidence in him.  (Pl.'s Dep. 127.)  Dabah ceased his practice

of visiting Plaintiff's office several times per day, and avoided Plaintiff.  (Pl.'s Aff. ¶ 14.)

Instead Dabah communicated to Plaintiff through Jonte.  (*Id.* ¶ 15.)  Plaintiff also alleges

that Dabah refused to look directly at Plaintiff during meetings, rarely addressed him, and

seemed constantly annoyed with him, despite his excellent work.  (*Id.* ¶ 16.)

Dabah allegedly told Plaintiff during Ramadan in 2005, when Plaintiff fasted

during the day, that Plaintiff looked like he had lost a lot of weight.  (Pl.'s Dep. 103.)

Plaintiff is not sure if Dabah meant to hurt his feelings with this comment, but he

interpreted it as a derogatory joke.  (*Id.* 106-07.)  Plaintiff also claims that Jonte made

several jokes about Ramadan, by inviting him to meals or indicating that he was going

out to eat with Dietrichson.  (Pl.'s Aff. ¶ 25.)

Around the beginning of 2006 Plaintiff requested time off to attend a religious

meeting in Atlanta, and Jonte was "cordial" in granting him permission to do so.  (Pl.'s

Dep. 119.)  Jonte had neglected to tell Plaintiff about a sales meeting about two weeks

away, which Plaintiff believes occurred on January 8, 2006 (Pl.'s Dep. 118-19), and

which conflicted with Plaintiff's scheduled trip to Atlanta.  Plaintiff traveled to Atlanta as

planned, and he contends that Jonte and Dietrichson subsequently mocked and criticized

him for missing the meeting.  (*Id.* 117, 120-22.)  By the time of this criticism, Plaintiff

believes that Dabah, Jonte, and Dietrichson had turned against him.  (*Id.* 122-23.)  The

latter two allegedly began teaming up against Plaintiff.  (*Id.* 120-23.)

9

During his own deposition Plaintiff conceded that his relationship with Jonte deteriorated, at least in part, because of his own work style and Jonte's management style. (*Id.* 126.) Jonte "realized that [Plaintiff] would not follow his exact orders every single time. He freaked out on [Plaintiff] a few times." (*Id.*)  The deterioration of their relationship is evidenced by a series of emails between Plaintiff and Jonte on January 12th and 13th of 2006. (Dabah's Aff. Furth. Supp. Def.'s Mot. Summ. J. ("Dabah's Aff. Furth.") Ex. C.) Dietrichson, Dabah, and others were also copied on the emails. (*Id.*)  In the emails Jonte expressed concern about Plaintiff not being on the same "calendar" as other employees, having missed the meeting discussed *supra*, and attempting to make design changes after orders had already been placed. (*Id.*)  Plaintiff responded in a long email that Jonte was wrong in attempting to "take over the development of the programs [he had] been working on." Plaintiff touted his industry expertise, stating that he is the "[f]inal word when it comes to [u]rban footwear design in the NYC and east [c]oast region . . . a leader in the area[s] of technical design, engineering, and development . . . a nationally recognized design director." (*Id.*)  He further indicated that any design changes not approved by him could result in mistakes and disrupt production. (*Id.*)  In closing Plaintiff wrote in capital letters: "DO NOT MAKE ANY ADJUSTMENTS TO MY SHOES WITH OUT [sic] DISCUSSING WITH ME BEFOREHAND." (*Id.*)

In another series of emails a few days later between Plaintiff, his design team, Jonte, and others, Plaintiff suggested that they produce a certain shoe design. (Dabah's Aff. Ex G; Pl.'s Dep. 121-22.) Jonte responded that it was too late to do so, and that Plaintiff had failed to complete the project at issue by the previous August as scheduled. (Dabah's Aff. Ex. G; Pl.'s Dep. 123.) Plaintiff now admits that he did not submit the

project by August (Pl.'s Dep. 123), but he responded in the email to Jonte that he believed it was not too late to submit designs, and he recommended that they go ahead with his suggestions. (Dabah's Aff. Ex. G.) Plaintiff argues that Jonte was in fact allowing Dietrichson to submit designs even at that supposedly late date. (Pl.'s Dep. 123.) Plaintiff did not know that designs had been submitted months ago because he missed the sales meeting discussed *supra*, and Dietrichson criticized him for this via the group email. (Dabah's Aff. Ex. G; Pl.'s Dep. 124.) Plaintiff thinks that Dietrichson felt defensive because his projects had not been successful, and that he was teaming up with Jonte. (Pl.'s Dep. 122.)

## III.    Summary Judgment Standard

Summary judgment may only be awarded where the absence of any genuine issue of material fact requires judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). When ruling on summary judgment motions, courts must construe all ambiguities and factual inferences in the light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In an employment discrimination case, a non-moving plaintiff must produce evidence upon which a reasonable trier of fact could conclude that discrimination was a determinative factor in the defendant's employment action. *Schnabel v. Abramson*, 232 F.3d 83, 90-91 (2d Cir. 2000). Courts may not infer discrimination on the basis of mere speculation or conjecture, but nevertheless should be cautious in granting summary judgment because discrimination by employers is often subtle. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999).

11

In employment discrimination cases courts apply a three step burden-shifting analysis. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). This analysis applies to all of Plaintiff's claims. *See Anderson v. Hertz Corp.*, 303 F. App'x 946, 947 (2d Cir. 2008) (discussing claims under § 1981 and § 296) (internal citations and quotation marks omitted); *Weinstock*, 224 F.3d at 42 n.1 (discussing claims under the Administrative Code of the City of New York). First, a plaintiff must establish a prima facie case of discrimination by showing that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Weinstock*, 224 F.3d at 42. The burden of proof at this stage of the case is minimal, and if satisfied gives rise to a presumption of discrimination. *Id.* Second, a defendant may rebut a prima facie case by providing a legitimate, non-discriminatory reason for its employment action. *Id.* If the defendant does so then the presumption of discrimination no longer controls. *Id.* Third, the burden then shifts to the plaintiff to show that the defendant's proffered reason for its employment action was pretextual and that discrimination was the real reason. *Id.* A plaintiff bears the ultimate burden of persuasion to show that a defendant's conduct reflected intentional discrimination. *Cross v. N.Y. City Transit Auth.*, 417 F.3d 241, 249 (2d Cir. 2005). Courts must examine the entire record when ruling on summary judgment motions, looking to several factors including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Id.* (internal citations and quotation marks omitted).

**IV.    Discussion**

The Court assumes Plaintiff meets the requirements of a prima facie case of discrimination.  Plaintiff is a member of protected racial and religious groups; was qualified for his employment position; and suffered an adverse employment action.  The evidence of discrimination proffered by Plaintiff, though weak, may support an inference of discrimination, given the minimal requirements of proof at this point in the Court's analysis.

In rebuttal, however, Defendant offers legitimate and non-discriminatory reasons for its decision to fire Plaintiff rather than to promote him.  First, it is undisputed that Defendant's sales revenue in Plaintiff's division dropped nearly eighty-four percent during the course of Plaintiff's employment, and that in response Defendant formulated a plan which saved money by creating a new position to oversee design at several of Defendant's brands, and replaced high-paid designers, such as Plaintiff, with lower-paid junior designers.[6]  Second, Defendant submits proof from Plaintiff's own deposition and from various documents that Plaintiff had difficulty working with others and that some of his work was untimely.  All of these facts provided Defendant with legitimate non-discriminatory reasons to terminate Plaintiff.

In contrast to these strong justifications for terminating Plaintiff, the weak evidence of discrimination proffered by Plaintiff cannot sustain his burden of showing that these reasons constituted pretext masking discrimination.  *See Weinstock*, 224 F.3d at 42.  At the end of the day, Plaintiff has failed to present sufficient evidence, as he must,

---

[6] Plaintiff acknowledged in his deposition that Defendant faced financial difficulties during his employment, and was not surprised to learn about Defendant's significant decrease in sales revenue. (Pl.'s Dep. 128-29, 177, 183.)

13

from which a reasonable trier of fact could determine that Defendant intentionally discriminated against him. *See Cross*, 417 F.3d at 249.

### A.   Evidence of Discrimination

After examining the entire record, the Court cannot conclude that any genuine issue of material fact exists as to whether Plaintiff was terminated because of his race. First, the two allegedly racist comments made by Dabah during the February 2004 meeting occurred six months before Defendant hired Plaintiff on a full-time basis, approximately one year before he received a fifty percent pay raise, and about two years before his termination. The third comment, allegedly made in February of 2005, when Dabah learned of the IRS wage lien letter sent to Plaintiff, occurred one month before Plaintiff's fifty percent pay increase and one year before his termination. Defendant also subsequently loaned Plaintiff money to pay the IRS lien. The timing of Plaintiff's hiring, as well as his pay raise and the loans he obtained from Defendant, demonstrate that Defendant expended significant effort to accommodate and retain Plaintiff, and undermine the notion that discrimination motivated his termination. Moreover, stray remarks by an employer do not prove discriminatory animus unless they causally connect to a plaintiff's wrongful termination claim. *See Townsend v. Clairon Inc.*, 26 F. App'x 75, 78 (2d Cir. 2002). The considerations *supra* show that the comments at issue lack a causal connection to Plaintiff's termination.

The fact that Dabah both hired and fired Plaintiff also demonstrates that Dabah was likely not motivated by racial discrimination. "When the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be consistent with the decision to hire."

14

*Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997). Plaintiff argues that Jonte, not Dabah, terminated Plaintiff, and that therefore the "same actor" defense does not apply. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. 12-13.) However, even if the Court considered Jonte to be the decision maker, Plaintiff has not provided any evidence that Jonte was motivated by racial animus. *See Anderson*, 303 F. App'x at 948 (denying a challenge to a "same actor" inference because plaintiff had not shown that the person who allegedly made the decision at issue was motivated by discrimination).

Plaintiff is not sure if racism actually motivated several of the other events he cites as evidence of racial discrimination. He does not know if Dabah yelled at an African-American junior designer to hang up a telephone because of his race. (Pl.'s Dep. 168.) He admits that he was excluded from design meetings because his presence was unnecessary and he was disruptive. (*Id.* 146-48.) He also admits that these meetings generally included two African-Americans. (Pl.'s Facts ¶ 55.) Plaintiff does not know if racism explains why Dabah called him an expletive (Pl.'s Dep. 165), why Dabah's father called him a "con man" (*id.* 151), or why Dabah "tackled" him. (Pl.'s Facts ¶ 48.) Problems with the factory and other organizational issues were endemic at Defendant (Pl.'s Dep. 88-94), and these issues do not bolster Plaintiff's argument that Dabah wanted him to fail in his position. Plaintiff speculates that Dabah instructed Jonte not to bring him on the trip to Japan for racist reasons, but he does not think that racism motivated Jonte himself. (*Id.* 137.) Also, two African-Americans went on this trip. (Pl.'s Facts ¶ 60.) Any racially discriminatory intent that can be gleamed from these ambiguous incidents is weak at best and in some instances constitutes mere speculation.

15

The Court also cannot conclude from the record that any genuine issue of material fact exists as to whether Defendant discriminated against Plaintiff because of his religion. Plaintiff claims that Dabah "wanted [him] out" after learning of his conversion. He claims that Dabah's and Jonte's attitudes towards him changed around that time and that Dabah "lost confidence in [him] because of [his] religious background . . . bas[ed] . . . [o]n the timing." (Pl.'s Dep. 127-28.) Such conclusory allegations are insufficient to oppose a motion for summary judgment. As an initial matter, Plaintiff testified in his deposition that Dabah learned about his conversion during a conversation in a taxicab, and that Dabah seemed to have no reaction. In a later affidavit Plaintiff omits this account and instead states that Dabah learned about his conversion from a co-worker and then went immediately to Plaintiff's office, asked him about his religion, and then stared at him silently for about a minute.[7] Regardless of when and how Dabah learned of Plaintiff's conversion, none of the incidents he describes, which are ambiguous at best, create a triable issue of fact as to whether religious discrimination motivated Defendant.

Plaintiff points to reduced contact with Dabah after Dabah learned of his conversion as proof of religious animus. This reduced contact with Plaintiff, however, coincides with Jonte becoming the brand manager in the fall of 2005. In that position, it is undisputed that Jonte oversaw design at Defendant's brands which allowed Dabah to concentrate on other responsibilities. (Dabah's Aff. Furth. ¶¶ 3-5.)

The other events cited by Plaintiff as evidence of religious discrimination are equally ambiguous and / or Plaintiff himself is not sure whether they were motivated by

---

[7] As discussed *supra*, when Plaintiff testified about this latter incident at his deposition, he alleged that Dabah approached him at his desk during Ramadan, when he was known to read the Koran while others were at lunch. Dabah then allegedly asked Plaintiff if he was reading the Koran and whether he was a Muslim, stared blankly at him for about a minute, changed the subject of the conversation, and walked away.

discrimination.  Plaintiff admits that he does not know if discrimination motivated

Dabah's remark during Ramadan.  (Pl.'s Dep. 103.)  He concedes that Jonte cordially

granted him permission to miss the sales meeting in January 2006 (Pl.'s Facts ¶ 61),

although subsequently Jonte may have joked about it along with Dietrichson.  Plaintiff

also alleges that Jonte joked about Plaintiff missing meals during Ramadan.  Yet these

jokes did not necessarily imply that Jonte and Dietrichson did not want to work with a

Muslim.

Plaintiff's admitted quarrels with Dabah, Jonte, and Dietrichson support the

conclusion that non-discriminatory reasons explain his deteriorating work situation.  He

admits that he clashed considerably with Jonte's management style, in part due to his

own aggressive style, and not solely because of conflicts originating with Jonte.

Plaintiff's exclusion from design meetings, which began ten or eleven months before

Dabah learned of Plaintiff's religious conversion (Pl.'s Dep. 148-49), and the email

exchanges discussed *supra*—which are undisputed documentary evidence—support this

conclusion.  Even assuming Jonte and Dietrichson teamed up on Plaintiff, it is mere

conjecture to infer that religious discrimination motivated their behavior.  In sum, the

facts do not support an inference that religious discrimination played a role in Plaintiff's

termination.

**B.    Defendant's Legitimate Non-Discriminatory Reasons for Terminating Plaintiff**

The parties do not dispute that Defendant lost substantial amounts of revenue

during Plaintiff's employment, and that its restructuring plan saved it significant amounts

of money spent on salaries.  In addition to terminating Plaintiff, Defendant fired the

manager of Plaintiff's division who earned three times the amount of Plaintiff, a junior

17

designer that worked under Plaintiff, and promoted Dietrichson to oversee design at several of Defendant's brands.

Plaintiff's argument that he should have been promoted instead of Dietrichson because of the superiority of his work is unavailing. Plaintiff has not offered any proof to substantiate this argument. On the other hand, the emails discussed *supra* and Plaintiff's own deposition testimony show that some of his work was untimely, that he did not communicate well with his colleagues, and that he clashed with some of them to such an extent that he was excluded from design meetings. According to Dabah, Jonte believed that Plaintiff's division was doing so poorly in large part because of its failure to timely deliver products. (Dabah's Aff. ¶ 27.) Jonte thought Plaintiff "had not exhibited leadership or teamwork abilities, was unable to accept criticism or recognize his own shortcomings, constantly blamed others for his own failures, and had no sense of urgency with respect to deadlines." (*Id.* ¶ 29.) Jonte opined that Dietrichson, however, "had exhibited excellent management and organizational skills and he believed the delivery of timely product would be improved under his management." (*Id.* ¶ 27.) Assuming *arguendo* that Plaintiff was a superior designer, Dietrichson was not promoted as a designer, but to a position as a design director, requiring very different skills. (*Id.* ¶¶ 27, 29.)

Even giving Plaintiff the benefit of the doubt that he was as qualified for the promotion as was Dietrichson, employers have significant discretion to choose between qualified candidates. *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001). This discretion is only limited to the extent that one candidate is so superior to the other that it would be unreasonable to choose the lesser qualified candidate, and

18

thus doing so could only serve to mask a pretextual reason for discrimination. *Id.*
Furthermore, an employer may use subjective criteria in selecting its employees, as long
as those criteria are reasonably clear, specific, and honest. *Id.* at 104-05.

Although Plaintiff may have shown some evidence of racial and religious bias,
the Court cannot conclude that Plaintiff's termination was the product of discrimination.
*See Woroski v. Nashua Corp.*, 31 F.3d 105, 109-10 (2d Cir. 1994) (finding some evidence
of bias but concluding that the totality of the circumstances required summary judgment
in favor of defendant). Plaintiff has provided only weak evidence of discrimination, even
drawing all inferences in the light most favorable to him. Conversely, Defendant has
provided substantial and legitimate justifications for terminating Plaintiff: the reduction
of its workforce and Plaintiff's difficulty working with other employees and timely
submitting work.

Considering the entire record, including the weakness of Plaintiff's prima facie
case and the strength of Defendant's proof of legitimate, non-discriminatory reasons for
terminating Plaintiff, the Court concludes that no reasonable juror could find that
discrimination played a determinative role in Plaintiff's termination. The Court therefore
grants Defendant summary judgment on Plaintiff's discrimination claims.

## V.     Defendant's Counterclaim

District courts may retain supplemental jurisdiction over state law claims even
when all claims forming the basis of original federal jurisdiction have been dismissed.
28 U.S.C. § 1367(c)(3) ("district courts may decline to exercise supplemental jurisdiction
over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over

19

which it has original jurisdiction"). Courts must reassess the exercise of supplemental jurisdiction in these circumstances based on judicial economy, convenience, fairness, and comity, but generally should dismiss such actions. *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 55-56 (2d Cir. 2004). One reason to retain jurisdiction is where the remaining state law issues are easily resolved. *See Waterman v. Transp. Workers' Union Local 100*, 8 F. Supp. 2d 363, 369 n.2 (S.D.N.Y. 1998) (citing *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993).

Plaintiff in this case agrees that he borrowed $25,000 from Defendant and that he paid back $14,800 before being terminated. (Pl.'s Facts ¶¶ 63-65.) He also agrees that he owes Defendant the remaining $10,200.[8] The awarding of pre-judgment interest is governed by state law. *See Schwimmer v. Allstate Ins. Co.,* 176 F.3d 648, 650 (2d Cir.1999). Plaintiff is ordered to pay Defendant the remaining balance, plus interest, at the rate of nine percent per annum beginning from the date he was terminated, February 17, 2006. *See* N.Y. Civ. Prac. Law and Rules §§ 5001 et seq.

## VI. Costs

Defendant may submit a request for costs in accordance with FED. R. CIV. P. 54(d) and Local Civil Rule 54.1.

## VII. Conclusion

---

[8] The Court notes that Plaintiff disputes, in his reply to Defendant's counterclaim, Defendant's assertion that the $25,000 Defendant gave him constituted a loan. (Pl.'s Reply to Counterclaims ¶¶ 52-54.) However, Plaintiff does not cite any evidence in support of this claim. Moreover, Plaintiff does not controvert Defendant's assertions regarding the $25,000 in his later response to Defendant's statement of facts pursuant to Rule 56.1. (Pl.'s Facts ¶¶ 63-65.) Accordingly, Defendant's assertions on this issue are deemed admitted by Plaintiff. Local Civil Rule 56.1(c).

For the reasons set forth above, Defendant's motion for summary judgment as to all remaining claims is GRANTED in its entirety, and its counterclaim is also GRANTED.  Because no further issues remain in this litigation, the Clerk of the Court is directed to close the case.

SO ORDERED.

Dated: September 22, 2009

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

21